MARY ANN JONES AND OTHERS, APPELLANTS, VS. THOMAS D. DEXTER, ADMINISTATOR OF CAROLINE V. SUMMERLIN, DEC'D, AND OTHERS, APPELLEES.

1. The act of 1828, which adopts the provisions of the law regulating descents as furnishing the rule for the distribution of personal estate, was intended to refer to any law of descents which might be in force at the time that the right to the distribution might become vested.

2. The two *provisos* contained in the act of 1829 regulating descents, and which constitute paragraphs ten and eleven of section one in Thompson's compilation, *do not apply* to the distribution of *personal* estate of an infant dying under the age of twenty-one.

3. Where the provisions of an act are adopted by a *general reference,* the act will receive a more liberal construction than if originally passed with reference to the particular subject.

4. Where a statute has been enacted with special reference to a *particular* subject and by another statute its provisions are directed *in general terms* to be applied to another subject of an essentially different nature, the adopting statute must be taken to mean that the provisions of the original statute shall be restrained and limited to such only as are applicable and appropriate to the *new* subject.

This case was decided at Tallahassee.

Appeal from Columbia Circuit Court.

Caroline V. Summerlin, daughter of complainant Mary Ann Jones, died an infant possessed of considerable personal estate, derived from her father Jacob Summerlin, deceased. Jacob Summerlin, at his death, left two children by his marriage with said Mary Ann Jones, one of whom was the said Caroline V. Summerlin, dec'd. He also left five children by a former marriage. After the death of said Jacob Summerlin, the complainant Mary Ann intermarried with James S. Jones, and by this marriage had three children at the time of the death of said Caroline V. Summerlin. At her death, therefore, Caroline V. Summerlin left her mother Mary Ann Jones, the surviving child of the marriage of Jacob Summerlin, deceased, with complainant Mary Ann Jones, being a sister of the whole blood, the five children of the first marriage of Jacob Summerlin, deceased, being brothers and sisters of the half blood by the father's side, and the three children of her mother Mary Ann Jones by her marriage with James S. Jones, being brothers and sisters of the half blood by the mother's side, as her heirs at law.

The bill of complaint was filed by Mary Ann Jones and her three children by her marriage with James S. Jones against the other heirs at law and against Thomas D. Dexter, who became administrator of the estate of Caroline V. Summerlin, dec'd, claiming that the estate personal of said Caroline goes in distribution to her mother, brothers and sisters, the mother and sister of the whole blood taking whole portions and the brothers and sisters of the half blood on both sides taking half portions.

The defendants demurred to the bill of complaint, which demurrer being sustained, complainants appealed.

*Archer & Papy* and *M. Whit Smith* for appellants.

278                    SUPREME COURT.

Jones et al. vs. Dexter, adm'r, et al.—Opinion of Court.

*Sanderson & Forward* for appellees.

DuPONT, J., delivered the opinion of the Court.

This case presents for the consideration and determination of the Court the important and interesting question as to the rule to be observed in the distribution of the *personal* estate of one dying in infancy.

In the year 1822, at the first session of the Territorial Legislature, then denominated the "Legislative Council," an act was passed known as the act regulating descents. This act continued on the statute book until the session held in the year 1828, when it was re-enacted by operation of the statute generally designated the "condensation act." That condensation act expressly repealed all acts theretofore passed which should not be enumerated in its body, and expressly re-enacted all such as should be so enumerated by their respective titles. Amongst the acts so enumerated was this act of 1822. At the same session of the Legislature in 1828, an act was passed directing the mode in which *personal* property should be distributed. The provision of that act is as follows, viz: "That, after all debts and legacies have been paid, the property remaining in the hands of the executor or administrator shall be distributed according to the provisions of the law regulating descents."

In the following year (1829,) and at the succeeding session, the Legislature passed a new act to regulate descents and repealed the old act upon that subject. The new act embodied substantially the provisions of the old act, but contained as "*provisos*" two sections not embraced in it. These provisos constitute paragraphs 10 and 11 of section 1 in Thompson's compilation, and are in the following words, viz:

"10. *Provided, however, and be it further enacted,* That

whenever an infant shall die without issue, having title to any real estate of inheritance derived by gift, devise or descent from the father, and there be living at the death of such infant his father, or any brother or sister of such infant on the part of the father or paternal grandfather or grandmother of the infant, or any brother or sister of the father, or any descendant of any of them, then such estate shall descend and pass to the paternal kindred, without regard to the mother or other maternal kindred of such infant in the same manner as if there had been no such mother or other maternal kindred living at the death of the infant, saving, however, to such mother any right of dower which she may have in such real estate of inheritance.

"11. And where an infant shall die without issue, having title to any real estate of inheritance derived by gift, devise or descent from the mother, and there be living at the death of such infant his mother or any brother or sister of such infant on the part of the mother, or the maternal grandfather or the grandmother of the infant, or any brother or sister of the mother, or any descendant of any of them, then such estate shall descend and pass to the maternal kindred without regard to the father or other paternal kindred of such infant in the same manner as if there had been no such father or other paternal kindred living at the death of the infant, saving, however, to such father the right which he may have as tenant by the courtesy in the said estate of inheritance."

It is upon the construction and application to be given to the first proviso that the question arises in this case. The facts of the case are briefly these: Jacob Summerlin died in Columbia county, in the State of Florida, leaving as his widow Mary Ann, (now Mary Ann Jones.) Prior

to his marriage with the said Mary Ann, he had by a former marriage several children, and several also by the said Mary Ann after his intermarriage with her, all of whom are defendants in this cause. At the time of his death he was possessed of a large personal estate, which was distributed in due course of law to his several children by both marriages. Mary Ann, the widow, afterwards intermarried with James S. Jones and has had by him three children, who, together with their mother, are the complainants in the bill. Caroline V. Summerlin, one of the children of the said Mary Ann by her first husband Jacob Summerlin, died an infant under the age of twenty-one years, leaving a considerable personal estate in the hands of her guardian, upon which estate Thomas D. Dexter, one of the defendants, administered. It is for the distribution of this *personal* estate that the bill has been filed. The Chancellor decided, that the " proviso," before referred to as being contained in the act regulating descents, was applicable to and formed the rule for the distribution of personalty, and that, as the property was derived immediately from the father, the mother and her children by her intermarriage with Jones were excluded from any participancy in the same. From that decision the appeal to this Court has been taken. .

Two positions are assumed by the counsel for the appellants: 1st, That the act regulating descents, of 1822, furnishes the rule for the distribution of the personal estate; 2nd, That even if it should be decided that the act of 1829, and not the act of 1822, is to be taken to furnish the rule, yet the *provisos* contained in that act and above recited are inapplicable and never were designed by the Legislature to refer to personal property. The converse of these propositions is held by the counsel for the appellees, and upon their resolution depend the rights of

the respective parties. The point in issue has never before been brought before this Court, and its importance has claimed, as it has received for it, our most anxious and mature deliberation.

The point first to be considered is, whether the prior act of 1822 or the subsequent one of 1829 shall be taken to furnish the rule for the distribution of the personalty. In order to fully appreciate the difficulty of the question, it must be noted that we have no *distinct and independent* statute prescribing a rule for the distribution of personal estate, but that the rule has been inaugurated by an act simply *adopting in general terms* "the provisions of the law regulating descents." It must be further noted, that the adopting statute was passed in 1828, which was after the date of the first statute of descents and prior to the passage of the second. Hence the difficulty of determining to which of these acts reference is to be had for the rule.

In tracing the history of our legislation upon this subject, it will be found that provisions similar, though not identically the same as the two "provisos" contained in our statute of 1829, are embraced in the act of Virginia, which was intended to regulate the descent of real estate in that State, and that, as with us, they adopted the law of descents as furnishing the rule for the distribution of personal property. These provisions in the Virginia statute of descents were adopted by the State of Kentucky upon the occasion of her admission into the confederacy, and from the similarity of the phraseology of the two "provisos" to be found in our act of 1829, it is quite probable that the idea was borrowed from the legislation of those States. In the mutations which occurred in their legislation upon the subject of descents, the question now under consideration arose in both States and was adjudicated by

their respective Courts of Appeal.   In both of those States it was decided that the act of descents which was in force at the date of the act which adopted the provisions of the law regulating descents as the rule for distribution should be taken to be the act referred to.   Upon reference, however, to the arguments of the Judges who delivered the opinions in those cases, it will be found that they based their decision *mainly* upon the ground that the prior act was particularly referred to in the adopting statute *by its title.*—Tomlinson vs. Dillard, 3 Call's Reps., 93 ; Tomlinson vs. Dillard, 1 Munf. Reps., 183 ; Pinkard et al. vs. Smith and wife, Littel's Select. Cases, 331.

In the construction of our statute of 1828, we are wholly relieved from the pressure which bore upon the Virginia and Kentucky Courts, growing out of the particular phraseology of their adopting acts.   Our statute makes no reference to any particular act, *by its title or otherwise,* but uses the broader and more comprehensive term  "*law*"— "the *law* regulating descents."   The term "law" is more general than the term "act," and is of much more extensive signification, and especially so in its application when the latter is limited and qualified by the designation of its title.   Had the Virginia and Kentucky acts been thus general, there is the strongest reason to conclude, from intimations to be gathered from the opinions delivered in the cases, that the determination of this point would have been the reverse of what it was.   But, upon principle, we are well satisfied that such should be the decision of the point in this case.   It would be monstrous indeed to hold, that because the provisions of a statute, especially enacted with reference to a particular subject, had been, by *mere adoption in general terms,* applied to a subject of an essentially different nature, those provisions still continued in force in relation to that other subject, notwith-

standing the original act should have been expressly re-
pealed. The bare announcement of the proposition fur-
nishes its own condemnation. It is illogical and wholly
incompatible with any idea of sound reason. We are not
unaware that there are instances where a repeal of the
original act operates no further than to affect the original
subject, and that its provisions may still retain their
vitality so far as they apply to the *new* subject notwith-
standing the repeal ; but this is not of that class of cases.
Our conclusion, then, upon the *first* point is, that the act
of 1828 was designed to refer to any law of descents which
might be in force at the time that the right to the distri-
bution vested. Under this ruling, we decide that the pro-
visions of the act of 1829 are to be taken as furnishing
the rule for the distribution of the *personalty* belonging to
this estate so far as those provisions may be found to be
applicable. This brings us to the consideration of the
second point proposed, viz: the *applicability* of the two
"provisos" contained in that act to personal estate.

The books furnish rules for the construction of statutes
as multiplied and various almost as are the statutes them-
selves. These rules are the work of ages. They have
been inaugurated and brought into practical application
by the exigencies of past adjudications, and all designed
to subserve one grand object—the ascertainment of the
legislative will. And while a great Judge—one of the
lights of the English bench—has said, that as new cases
shall arise so must new rules be necessarily applied, we
are inclined to the belief that the present body of rules
will be found amply sufficient to meet any case of con-
struction that can possibly arise. Indeed, we are inclined
to look upon what are usually denominated "rules" rather
as "principles" deduced from, than as the rules them-
selves. In this view of the subject, we can perceive no

necessity for adding to the admirable, comprehensive and well-defined rules which have been announced by the two masters of the common law, Coke and Blackstone. Without encumbering the argument with a formal discussion of these rules, it will suffice to state a few of the principles which have served to guide us to the conclusion at which we have arrived upon the point now under discussion.

It is laid down, that "a remedial act shall be so construed as most effectually to meet the beneficial end in view and to prevent a failure of the remedy. As a general rule, a remedial statute ought to be construed liberally. Receiving an equitable or rather a benignant interpretation, the letter of the act will be sometimes enlarged, sometimes restrained, and sometimes, it has been said, the construction made is contrary to the letter, which should be read, *ultra* the letter and confined to ancient statutes. Thus it is laid down that a statute may be extended to *other cases* within the same mischief and occasion of the act, though not expressly within the words."—Dwarris on Statutes, 614.

"It is a sound rule of construction, but applicable" (said Lord Denman in a recent case) "to modern as well as to ancient statutes (perhaps, indeed, more so from necessity, in consequence of the looseness of expression which now prevails,) that in the construction of *general references* in acts of Parliament, such reference must be made only as will stand with reason and right." "Where a provision is in its original·and natural application limited in respect to time and place, it is to give to general words of incorporation a meaning contrary to reason, and it may be to justice, to hold that they apply to it."—Dwarris on Statutes, 602, citing 2 Inst., 287; 6 Q. B. Reps., 343.

"A clause of reference to an excise statute was held to

extend only to the general powers and provisions of that law, and not to every particular clause."—Dwarris on Statutes, 602.

"The fair construction," said Ashurst, J., "to put upon the clause of reference in question" (which was a general clause) "seems to be this, that all the general powers and provisions given and made in acts *pari materii* shall be virtually incorporated in this, but that such provisions as are always considered as *special* provisions shall not."—*Ib.*

The doctrine to be deduced from these citations, and which is peculiarly applicable to the construction of our statute is, that where the provisions of a statute are adopted by *general reference*, it will receive a more liberal construction than if originally passed with reference to the particular subject.

"In applying rules for interpreting statutes to questions on the effect of an enactment, we can never," says Vattel, "safely lose sight of its object. That must be the truest exposition of a law which best harmonizes with its design, its objects and its general structure."—Dwarris on Statutes, 556, citing Vattel, bk. 2, ch. 17, § 285.

With all the light afforded us by the very able argument of the counsel for the appellees, we have found it quite impossible, under the guidance of these principles, to resist the conclusion that it never was the intention of the Legislature, in adopting "the law regulating descents" as a rule for the distribution of personal property, that the "provisos" in the act of 1829 should be taken to apply. In arriving at this conclusion, we have not been unmindful of the caution contained in the suggestion as to the unsettling of estates, but we are yet to be satisfied that such would be the effect of this ruling; for, considering the brevity of our political existence and the extreme

rarity of estates thus derived, there cannot, in the nature of things, be much cause for apprehension on that score. At any rate, it is the imperative duty of this Court to announce the law as it is, and not to be deterred from its duty by considerations so remote and uncertain.

The nature of the property and the title by which it is held, to say nothing of the peculiar inapplicability of the saving clauses in those provisos, show conclusively to our minds that it could not have been the design of the Legislature that they should apply to personal property. If we look to the transitory nature of that species of property, it must be acknowledged that it is unsusceptible of any marks by which it could be traced to either the father or the mother as the source of acquirement. By what marks of designation could *stocks* be traced? How would we proceed to identify *money?* Could any means be devised to trace the origin of a stock of horses, cattle, hogs, sheep, &c., &c.? Even slaves themselves, held, as they may be, independent of the muniment of a paper title, may, in the lapse of years, be subjected to such changes as to render their origin extremely doubtful and uncertain.

But if the *nature* of the property furnishes an argument against the applicability of these provisos, what shall be said of the *title* by which it is holden? It would be unjust and highly offensive to the legislative branch of the government to presume that they were ignorant of the principles of the common law as applicable to this species of property, and yet such must be the conclusion, if we hold that they intended to apply these provisos to that kind of property; for, to what purpose would they establish such a rule for its distribution, when, by the canons of that law, *all* the personal property of the wife becomes the husband's by the act of marriage? If the provisos are to have the application contended for, we must attribute to the

Legislature either a total ignorance of this principle of the common law or the perpetration of a very senseless act of supererogation. But, to avoid this category, it has been suggested in this connection that the provisos referred to ought to be so construed as to admit of the enquiry whether the particular property was brought into the marriage by the father or by the mother. The answer to that suggestion is, that *that question* is at rest in this Court, it having been authoritatively settled in the well-considered case of Smith et al. vs. Croom et al.—7 Flo. Reps., 81. It was ruled in that case, after a most elaborate discussion *pro* and *con* by counsel of the highest character, assisted by two eminent jurists from South Carolina and Georgia, that the words "gift, devise or descent from the father," or "from the mother," occurring in the provisos embraced in the act of 1829, contemplated an *immediate* and not a *mediate* descent. In other words, that the statute was to be so construed as to limit the taking by the infant to the parent from whom his title was *immediately* derived. Now, it is perfectly manifest and beyond all controversy, that, with respect to the *realty*, the Legislature designed that these two provisos should be perfectly *reciprocal;* that if the estate came to the infant from the father, it should upon his decease go to the paternal kindred; and if, on the other hand, it came from the mother, it should, under like circumstances, go to the maternal kindred. This principle of *reciprocity* is so patent upon the face of the statute, that no one has ever attempted to question it with reference to the *realty*. It is the prominent characteristic of the enactment, standing out in such bold relief as to hush every whisper of dissent. If this be so, with what show of reason can the Court be called upon to apply this enactment to the *personalty*, when, from the very

nature of the property and the laws governing the same, this principle of reciprocity cannot prevail? To give such an interpretation would be to make the adopting act of 1828 speak a language wholly foreign to the manifest intention of the Legislature. In support of this view, we refer to Dwarris on Statutes, where it is said, that "the words of an act are always to be modified by reference to the *subject* about which it is conversant."

"In construing an act of Parliament, the same rules of construction must be applied as in the construction of other writings; and if the *subject-matter* to which an act of Parliament applies be such as to make a given construction of its clauses impossible or irrational, 'I cannot,' said Wigram, V. C., 'for a moment doubt the right or the duty of the Court to have regard to such *subject-matter* as necessarily bearing upon the legal construction of the act. This is invariably done in the construction of wills and deeds, and the same principles are correctly applicable to the construction of an act of Parliament.' "— Dwarris on Statutes, 508, 581, citing Salkel vs. Johnson, 1 Hare, 210.

And again: "In construing the words of an act of Parliament and collecting from them the intentions of the Legislature, the terms are always to be understood as having a regard to the *subject-matter*, for that, it will be remembered, will always be in the eye of the framer of the law and all his expressions directed to that end."—*Ib.*

From the principles thus announced, it is not difficult to deduce the rule, that where a statute has been enacted with special reference to a *particular* subject, and by another statute its provisions are directed *in general terms* to be applied to *another* subject of an essentially different nature, the adopting statute must be taken to mean that the provisions of the original statute shall be restrained

and limited to such only as are applicable and appropriate to the *new* subject. If such qualification be not observed, then with reference to the construction of this statute the absurdity is involved of giving to the mother "dower" and to the father "courtesy" in the *personal* estate of the infant, for both of these rights are secured by the *saving* clauses of the respective sections. How can either of these rights be predicated of *personal* property? The terms used are purely technical, and the rights saved pertain exclusively to *real* estate. If, then, the *saving clauses* may be rejected when about to deal with the *personalty*, (as they must be,) we can discover no good reason why the entire proviso may not be also rejected as wholly inapplicable to the *subject-matter* to be affected.

Although not insisted upon, or even referred to, in the brief furnished by the appellees, it was, however, admitted by the counsel for appellants, that the provisos to be found in our act of 1829, and now under consideration, are *copies* from the Virginia act of 1792. Upon this admission, the suggestion has been made to the effect that, having adopted the Virginia act as a part of our statute law, we are bound by the interpretation given to it by the Courts of that State.

We are aware that it has long been the current and prevalent opinion of the profession that the two provisos embraced in our act of descents owe their paternity to the act of Virginia of 1792, but, upon a critical comparison of the two acts, this will be found to be an error. Our act has already been set out at large in this opinion, and, for greater facility of reference, we here set out the sections of the Virginia act:

"Where an infant shall die without issue, having title to any real estate of inheritance, derived by purchase or

descent from the father, the mother of such infant shall not succeed to nor enjoy the same, nor any part thereof, if there be living any brother or sister of such infant, or any brother or sister of the father, or any lineal descendant of either of them, saving, however, to such mother any right of dower which she may claim in the said real estate of inheritance.

"Where an infant shall die without issue, having title to any real estate of inheritance, derived by purchase or descent from the mother, the father of such infant, nor any issue which he may have by any person other than the mother of such infant, shall succeed to and enjoy the same, or any part thereof, if there be living any brother or sister of such infant, or any brother or sister of the mother, or any lineal descendant of either of them, saving, however, to such father the right which he may have as tenant by the courtesy in the said estate of inheritance."

It is perfectly obvious to the most cursory inspection that the enactment of the two States upon this subject is totally different, at least in point of phraseology, and every lawyer knows the controlling influence which the peculiarity of language always exerts in a matter of construction; but it is not in *phraseology* alone that they differ. The difference exists in matter of *substance* likewise; for, while by the Virginia statute the succession in the right line *ascending* extends to and includes only the father and the mother, by our statute the "grandfather and grandmother" are embraced. In the face of such obvious variances between the legislation of the respective States upon this subject, how, with any show of reason, can it be said that we have adopted the legislation of Virginia?

Again: The variance in the legislation of the two States is not confined alone to the provisos contained in the respective statutes of *descents*. It is equally and, if any-

thing, more marked in the acts which profess to adopt these acts as furnishing the rule for distribution. The adopting act of Florida is in these words:

"After all debts and legacies have been paid, the property remaining in the hands of the executor or administrator shall be distributed according to the provisions of the law regulating descents."—Thomp. Dig., 191.

The adopting statute of Virginia is as follows, viz:

"If there be no wife, then the whole of such surplus shall be distributed *in the same proportion and to the same persons* as lands are directed to descend in and by an act of the General Assembly entitled an act to reduce into one the several acts directing the course of descents."

While our act, in its reference to the law regulating descents, is as *general* as it could be made, the act of Virginia is as *special* and *definite* in its designation of the "proportions" and the "persons" to take as it was in the compass of language to make it. To ascertain what weight these particular words had in conducting to the conclusion arrived at in the case of Tomlinson vs. Dillard, before referred to, it is only necessary to refer to the language of the several Judges who delivered opinions in the same; for, it will be admitted that they all desired that the law should have been the other way. So great indeed was their anxiety and so urgent their recommendation, that at the very next session of the Legislature the law was altered to meet their views. Fleming, J., said: "The language of the acts of Assembly leaves no room for criticism. That concerning the course of descents excludes the mother in terms from any share in the real estate, and that concerning distributions, passed at the same session of the Legislature, has declared that the personal property shall be distributable in the same manner and *go to the*

*same persons* with the real estate. This fixes that *the same persons* are to take both estates."

Carrington, J., referring to the language of the act, said: "This declaration leaves no room to doubt; for it is a clear expression of the legislative will that there shall be no distinction *as to the persons* who are to take, whether the estate be real or personal."

Pendleton, Pres., used this language: "But the words of the law appear to me to be too strong to admit of any construction by this Court, as they expressly direct that the personals shall go *to the same persons* as lands go to under the new law of descents."

Roane, J., one of the most eminent jurists of that day, *dissented* from the judgment of the Court, and, totally repudiating the idea of the applicability of these provisos to a case of distribution, concluded his masterly argument in the following language: "My conclusion, then, is, that the act of descents merely gives the *general* rule for the distribution of personal property by reference to the act of descents, but that, taken as well in relation to other laws or statutes as to *considerations* which are equal to such laws or statutes, it is only *lex sub graviori lege.* I will not bottom myself upon the mere letter of the statute (and that, too, couched under only *general* words of reference) and obstinately contend for a construction which is reprobated by the actual nature of the subject, confronted by so many absurdities, contradictions, inconveniences and incongruities, and the consequences of which will operate undoubtedly against the manifest *intention* of the Legislature."

The Kentucky case of Pinkard vs. Smith, before cited, however it might affect the argument upon the point first discussed, can have no bearing upon the one now under consideration, viz: "The *applicability* of the provisos to the

personal estate." By that case it was ruled that the Vir-
ginia act of 1785, which had been adopted by the Legisla-
ture of Kentucky upon her admission into the confeder-
acy, was the particular act referred to in their statute
making the course of *descents* the rule for the *distribution*
of personal property. The provisions concerning the estate
of a deceased infant were not incorporated in that act
and, consequently, this point could never arise in that
State.

That we shall declare *the intention of the Legislature*
by adopting the conclusion at which we have arrived, we
are fully satisfied. This construction of the statute is emi-
nently just and proper. It is consonant with the best
affections of the heart and commends itself to the general
approval of mankind.

Let the decree of the Chancellor be reversed and set
aside, and let the cause be remanded to the Court below,
with instructions to proceed therein upon principles con-
formable to the views expressed in this opinion. The
costs of this appeal to be paid by the appellees.

BALTZELL, C. J., dissenting:

Not concurring with the majority in the decision made,
it is incumbent upon me as an act of duty to set forth the
grounds of my dissent.

There is no difficulty as to the facts of the case, which
are agreed to be as follows: Jacob Summerlin departed
this life some years since, leaving a large estate, both real
and personal, which was divided among his widow and
seven children. One of these children, Caroline Summer-
lin, died in infancy, after her father, leaving considerable
personal property derived and inherited from him, which
is the subject of the present controversy. His widow
intermarried with James S. Jones, by whom she has

three children, by whom and the wife this suit is institu-
ted to recover full shares of this property, claiming to be
entitled thereto as distributees and heirs of Caroline Sum-
merlin in common with the other children of Jacob Sum-
merlin.

The law of the case is as follows:

"Property remaining in the hands of the executor or
administrator, after all debts and legacies have been paid,
shall be distributed according to the law of descents."—
Thompson, 191.

The law of descents, so far as it is applicable, is in these
words:

"Whenever any person, having title to any real estate
of inheritance, shall die, it shall descend in parcenary to
the male and female kindred in the following course: that
is to say, if there is no father, then to his mother, brothers
and sisters and their descendants, or such of them as there
be: *Provided, however,* That whenever an infant shall
die without issue, having title to any real estate of inheri-
tance derived by gift, devise or descent from the father of
such infant, and there be living at the death of such infant
his father or any brother or sister of such infant on the
part of the father, then such estate shall descend and pass
to the *paternal kindred* without regard to *the mother or
other maternal kindred* living at the death of the infant;
saving, however, to such mother any right of dower which
she may have in such real estate of inheritance."—Thomp.,
188-9.

Very clearly the express words of the law give the pro-
perty of this infant, Caroline Summerlin, derived from her
father, to her brothers and sisters on the father's side, the
Summerlins, and not to her mother, Mrs. Jones, nor to her
children by Jones.

Not because there is actual difficulty, (for, with due def-

erence, I think the case is too plain to admit of argument,) it may be necessary to refer to the state of the law when the act of 1829, as to descents, was passed.

One of the first laws passed by the Territorial Legislature, as early as the 12th of August, 1822, was "a law regulating descents." During the same session, also, was passed the law quoted as to the distribution of the personalty, which has remained in force all the time. In 1829 a law was passed containing the leading sections of the act of 1822, but with some new provisions. By this law of 1829, "*all acts and parts of acts now in force* and coming within its provisions were repealed."—Duval, p. 363. So far, then, as the law of 1829 repeals that of 1822, to that extent the latter thereafter ceased to be a rule of action, so that the inquiry is an important one, to ascertain what was repealed. There were no provisions, such as the 10th section of the law of 1829 quoted above, with the 11th, making a like regulation as to the property derived from the mother, in the law of 1822, so that by it the personalty certainly (if not the realty) passed to the mother and brothers and sisters, whether of the whole or half blood, as by the statute and common law of England.—1 Will., 252; 2 Will. on Ex'ors, 925. The incorporation of these provisions in the law of 1829, and the express repeal of all acts and parts of acts then in force and coming within its purview, abrogated this descent to the mother and brothers and sisters as existing by the law of 1822.

The mischief under the old law would seem to have been the giving the property to those not connected by blood with the person from whom it was derived. The remedy was the passage of a law with clauses prohibiting such transfer, and by the primary canon of construction it is declared to be "the duty of the Judges at all times to

make such construction as should suppress the mischief and advance the remedy, putting down all subtle inventions and evasions for the continuance of the mischief *et pro privato commodo*, and adding force and life to the cure and remedy, according to the true intent of the makers of the act, *pro bono publico*."—1 Black., 87; Dwar. on Stat., 717.

How a provision that has been expressly and directly repealed can be made to confer a right of property, is wholly beyond my powers of comprehension. The 10th and 11th sections do not apply to personalty, it is said, because of its nature, the difficulty of identifying it, the title by which it is holden, and, still farther, for want of reciprocity. As to the two former, no difficulty exists in this case, as all the property of the infant is admitted to have been derived from the father. It is strange that all the objections did not occur to the Legislature to prevent the passage of the law—stranger still, that in practice in no case for near thirty years since its enactment has complaint been made on this account. By common consent of lawyers, judges and people, this has been the settled construction, and estates during all this time have been settled and adjusted and rights derived and acquired under it. Our digests and compilations have been on this understanding. These same objections, scarcely varying in language or form of expression, were stated by one of the Judges of the Court of Appeals of Virginia and earnestly insisted on, but overruled by four of his associates, and again urged on other occasions and overruled upon statutes almost identical with ours.

Thus Fleming, Judge: "It is in vain, therefore, to urge the confusion and difficulties which it is said must ensue from this mode of interpreting the law, because the Court are bound down by its positive precepts and have no dis-

cretion in the matter; for, whatever latitude a Court may think proper to indulge where the expressions are ambiguous, they certainly have no right to do so when the words are clear; but if inconveniences follow from a literal construction, they must be redressed by the Legislature and not by the Court, who are not to torture the words in order to discover meanings which the Legislature never had, but are to preserve the plain import of the statute without regard to the consequences." Carrington, Lyons and Pendleton, President, expressed themselves more strongly to the same effect.—3 Call, 115. Another effort was made before the same Court in favor of the same views, but with less success than on this occasion, as not one of the Judges favored the objections.—1 Munford, 183; 2 Munf., 279.

In Kentucky a similar statute and similar provisions were enfored. In this State a distribution was decreed to the same effect.—Young's adm'r vs. McKinnie, 5 Florida, 542, 551. And yet these exploded notions of a single Judge, uttered in 1801, denounced by his own Court of four to one, condemned by the action of other Courts and not followed anywhere, are fixed upon as the views of the action of this Court in direct opposition to rules and principles declared over and over again as applicable to such subjects. One of these is, that where a statute is in the terms of the law of another State, or of an English statute, the construction of their Courts is to be regarded as much so as if it had been detailed at length in the statute.—Reeves on Descents, 26.

If the provisos of the 10th and 11th sections are not in force as to the personalty, how are they to be separated and detached from the section to which they pertain? They are part and parcel of the third section, under which the mother, brothers and sisters derive their descent, and may no more be dispensed with than the section itself.

If one is stricken out and disregarded the other must be so too, otherwise the anomaly is presented of an enactment carried into effect stripped of a leading and direct provision qualifying it in a most important and essential point. The statute says the property shall go to the mother, brothers and sisters, provided that when it is derived from the father it shall go to the paternal kindred, and not to the mother, and from the mother to the maternal kindred. Now by what process is a part of the statute saved and enforced and the other destroyed or disregarded? If availing for the personalty in the one case, why not in the other? "The effect of repealing a statute is to obliterate the statute repealed as completely as if it had never passed, and it must be considered as a law that never existed except for the purpose of those actions or suits commenced, prosecuted and concluded while it was an existing law."—Smith's Con., 889; Key vs. Godwin, 4 M. & C., 341, 351.

Now, considering the act of 1829 and the law for distribution of the personalty together, without reference to the act of 1822, can any doubt exist as to the operative force and influence of the provisos—the 10th and 11th sections—as to personalty? There seems to me to be an entire misconception as to the subject of reciprocity. What can there possibly be between these complainants and the the children of Jacob Summerlin? Reciprocity would dictate, if Jones' children succeed here, that the Summerlins would share with the children of Jones in case of their deriving property from their father or mother, and yet is anything of this kind pretended?