RICHARD M. BUSHNELL, ADMINISTRATOR OF ISABEL FORSYTH, *et al.* vs. WILLIAM DENNISON, INFANT, &c.

The law of descents in 1828 provided that the real estate of intestates should descend in parcenary to the male and female kindred in a certain course, viz.: 1, to children; 2, to the father; 3, to the mother, brothers, and sisters; 4, for want of these or their descendants, to paternal and maternal kindred in moieties, &c. In that year provision was made by law, that personal property should " be distributed according to the law regulating descents." In 1829, the previous law of descents was repealed and re-enacted, with *provisos*, (Duval's Compilation, 361,) that whenever an infant shall die without issue, having title to any real estate of inheritance derived from the father, and there be living any kindred on the side of the father of the infant, such estate shall pass to the father or the paternal kindred, without regard to the mother or maternal kindred, saving the mother's right of dower. And if the real estate of such infant was derived from the mother, the same should descend to the mother or maternal kindred, without regard to the father or paternal kindred: *Held*,

1. That the act of 1828 adopting " the law regulating descents" as the rule for the distribution of personal estate, applies to any law regulating descents in force at the time that the right to the distribution becomes vested, (agreeing with Jones vs. Dexter, 8 Fla. 276.)

2. The *provisos* contained in the act of 1829, entitled " An Act Regulating Descents," being paragraphs 10 and 11 of section 1, are part of the law regulating descents, and furnish a rule for the distribution of the personal estate of an infant, derived from the father or the mother, as the case may be, it being the intent of the law that the personal estate should be distributed by the same rule that governs the descent of real estate.— (Overruling the decision in Jones vs. Dexter.)

Appeal from an interlocutory order of the Circuit Court for Escambia county.

The opinion states the facts and the points involved.

*Mallory & Maxwell* for Appellants.

*Campbell & Jones* for Appellee.

RANDALL, C. J., delivered the opinion of the Court.

The facts are briefly thus : Joseph Forsyth died leaving a widow and three children, to-wit : Isabella, Josephine and Mary. The widow, (mother of the three children,) afterwards married one Dennison, and had one child, William Dennison, the appellee. The mother died, and afterwards Isabella, leaving her two sisters of the whole blood and her brother of the half blood surviving. The bill in this case was filed by the said William Dennison *per pro ami*, to recover one-fifth of the personal estate of Isabella, which had been derived from her father, Joseph Forsyth. The administrator of Isabella filed a demurrer to the bill which was overruled by the Circuit Court, and from this ruling an appeal was taken by the administrator.

The question presented involves the determination of the rule for the distribution of the personal estate derived from the father of an infant dying without issue.

The history of the legislation affecting the question, is given in the opinion of the Court in Jones vs. Dexter, 8 Fla., 276.

In 1822, at the first session of the Territorial legislature, an act was passed known as the act regulating descents.— This act continued in force until the year 1828, when it was re-enacted by the statute known as the " condensation act." That condensation act expressly repealed all acts theretofore passed, which should not be enumerated in it, and expressly re-enacted all such as should be so enumerated by their respective titles. Amongst the acts so enumerated was this

act of 1822.  At the same session in 1828, an act was passed directing the mode in which *personal* property should be distributed.  The provision of that act is as follows :  " That after all debts and legacies have been paid, the property remaining in the hands of the executor or administrator shall be distributed according to the law regulating descents."

At the next session of the Legislature, in 1829, a new act to regulate descents was passed and the old act on that subject was repealed.  The new act embodied substantially the provisions of the old act, but contained as provisos two additional sections.

The provisos enacted, " 10th, That whenever an infant shall die without issue, having title to any real estate of inheritance derived by gift, devise or descent from the father, and there be living at the time of his death his father, or any brother or sister of such infant on the part of the father or paternal grand-father or grand-mother of the infant," &c., then such estate shall pass to the paternal kindred, without regard to the mother or other maternal kindred, " saving, however, to such mother any right of dower which she may have in such real estate of inheritance."

The 11th subdivision being the second proviso, declares that the real estate of an infant derived from its mother, in case of its dying without issue, shall descend and pass to the mother and maternal kindred without regard to the father or other paternal kindred, " saving, however, to such father the right which he may have as tenant by the courtesy in the said estate of inheritance."

These statutes are, as to their legal effect, substantially the same as those of Virginia, which received a construction by the Virginia Court of Appeals in 1801, and again in 1810.  That construction was that the statute of distribution, requiring the personal estate of deceased persons to be distributed according to the law regulating descents, gave the personal estate of an infant deceased without issue, to the paternal kindred, if the estate was derived from the father

to the exclusion of the mother and the maternal kindred ; and to the maternal kindred if the estate was derived from the mother, to the exclusion of the paternal kindred ; in fact giving the personal estate the same direction as the real. I am unable to discover on examination of the statute of Virginia any such substantial difference as to its effect in this case, or in the case of Jones vs. Dexter, as was perceived by the majority of the Court in that case. Our statute, if not borrowed from that of Virginia, must have been copied or derived from the same source.

The Court of Appeals of that State in 1801, when the case of Tomlinson vs. Dilliard (3 Call, 105,) was first considered, was composed of five judges, four of whom concurred in the construction stated, and one, (Judge Roane,) dissented, holding that the personal estate of an infant should be distributed under the statute according to the general law of descents, and that the proviso controlled only the course of the real estate.

In 1810 the same case came again before the same court, then composed of three judges, two of whom were members of the court in 1801. The opinion of Judge Roane upon the last argument (in 1810) was very able and elaborate, reiterating his former conclusions. (1 Munford, 183.) While his associate, Fleming, then become president of the court, and Judge Tucker, who had not participated in the former decision, re-affirmed the judgment first given, considering " that the words of the law are too plain and positive to admit of doubt or construction," and " too clear and explicit to admit of a doubtful meaning." (See also Tarpleman vs. Steptoe, 2 Munf. 389.) The statute of Virginia provided that the personalty should " be distributed in the *same proportion and to the same persons* as lands are directed to descend in and by an act of the General Assembly, entitled an act to reduce into one the several acts directing the course of descents." The statute of Florida says " the property remaining in the hands of the executor or administrator shall be

distributed *according to the provisions* of the law regulating descents." The law "regulating descents" in both States being substantially alike, I can discover no difference in the application of the law of distribution. The words, "distributed in the same proportion and to the same persons," in the one case, and the words " according to the provisions of" the same law, are so nearly alike in their evident intent, that I have been unable to discover any reason for applying them to diverse provisions.

The Virginia Judges were evidently desirous of giving a different construction to their statute, and would have done so if they could have discovered any "manifest intention" of the Legislature to justify a departure from a plain and positive provision of the law; for it seems they were so thoroughly opposed to the law, as they felt obliged to construe and apply it, that they besought the legislature to change it, and it was changed in accordance with their suggestion.

Very many of the prominent men who were the pioneers and early settlers in this portion of the country came from Virginia, and it was natural that they should bring with them a partiality for many of the laws of their native State, and that the laws relating to the descent of property were among those to which they attached great importance is beyond question. It is equally certain that the Legislature, composed of intelligent gentlemen, in adopting a statute of another State, are presumed to know the effect and the interpretation given to such law by the courts of the State from which the law was borrowed, and particularly of this important law which had been construed by the Court of Appeals, and whose decision must have been known quite familiarly to gentlemen of the legal profession, many of whom came to Florida from the " Old Dominion." These circumstances have more or less bearing in finding the intent of a statute, and are frequently considered by the highest courts in their constant endeavors to carry out the purposes

of law makers. " *Contemporanea expositio est fortissima in lege.*" ·

It is therefore quite probable that it was intended that the language of a Virginia law enacted here, should have the same force and meaning in Florida as in Virginia, and that the interpretation it had received in Virginia would be given to it in this State. Such seems to have been the case. Judge Thompson has this note on p. 191 of the Digest : " In the case of Marr et al. vs. Keenan, before the Hon. Thomas Douglass, in Gadsden county, Fall Term, 1845, it was ruled that the ' law regulating descents' referred to (in the section providing for distribution of personalty,) was such law regulating descents as might be in force when the contingency happened. That the Legislature intended that real and personal estate should be distributed according to the same rule." Judge Douglass afterward in 1854, as a Judge of the Supreme Court, in the case of Young's adm'r vs. KcKinnie's adm'r, 5 Fla., 542, giving the opinion of the Court, held that the surviving brother of an infant took all the personal estate of the deceased which was derived from the father, the mother not being entitled to inherit. It is true it does not appear that the question was argued in reference to the question now before us, but the court in that case affirmed the decree in that respect, which decree treated the property as that of the surviving brother " without regard to the mother" who survived.

It may be said that this decision was not entitled to much weight as authority, but it was a solemn adjudication of the rights of property upon principles of law which appear to have been treated *as settled* and unquestioned, so far as can be judged by the published report of the case, (and it is remarked, by the way, that one of the counsel for the appellant in that case is of counsel in this case, and the Justice who delivered the opinion in Jones vs. Dexter was of counsel on the other side.)

It is stated in the dissenting opinion of Baltzell, C. J., in

Bushnell vs. Dennison—Opinion of Court.

Jones vs. Dexter, that for thirty years before (1859,) " by common consent of lawyers, judges and people, this had been the settled construction, and estates during all this time had been settled and adjusted and rights derived and acquired under it.   Our digests and compilations have been on this understanding.    These same objections, scarcely varying in language or form of expression, were stated by one of the justices of the court of Appeals of Virginia, and earnestly insisted on, but overruled by four of his associates, and again urged on other occasions and overruled upon statutes almost identical with ours."    And he quotes Reeves on Descents, 26 :   " Where a statute is in the terms of the law of another State, or of an English statute, the construction of their courts is to be regarded as much so as if it had been detailed at length in the statute."

In the case at bar, the circuit judge decided, in overruling the demurrer, in accordance with the judgment in Jones vs. Dexter, that the provisos (numbered 10 and 11,) applied only to the real, and that the personal estate was distributable according to the law, excluding the provisos.   The appellants ask that the doctrine of the decision in that case be overruled.   The appellees insist that that decision was correct, and that the rule in that case has been the law of the State for eleven years, as a rule of property, and has controlled the settlement of estates.   That in construing statutes, the office of the court is to give certainty and precision to arbitrary rules, and hence the rarity of conflicting decisions upon statutes.   " That after a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration of the law and to regulate their actions and contracts by it." " When a rule has been once deliberately adopted and declared, it ought not to be disturbed unless by a court of appeals, and never by the same court, except for very cogent reasons and upon a clear manifestation of error."

" But even in such cases, (says Broom's Legal Maxims, 62,) the subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation. For, if it be found that the former decision is manifestly absurd or *unjust*, it is declared, not that such sentence was bad law, but that it was not law ; that is, that it is not the established custom of the realm, as has been erroneously determined."

In the opinion in Jones vs. Dexter, the court was not unmindful of the great importance of adhering to former decisions in cases of this character, and of the cautions suggested as to the unsettling of estates, " but we are yet to be satisfied (say the court) that such would be the effect of this ruling ; for considering the brevity of our political existence and the extreme rarity of estates thus derived, there cannot, in the nature of things, be much cause for misapprehension on that score. At any rate, it is the imperative duty of this court to announce the law as it is, and not to be deterred from its duty by considerations so remote and uncertain."

Impressed with the importance of abstaining from an unwarrantable departure from the unbroken current of decisions of the courts in respect to those rules of property and common rights under which and upon the strength of which rest the security of all the business transactions of life, we hesitate upon the threshhold of inquiry and first determine whether, whatever our private notions and individual judgment may be, we shall entertain the inquiry which is presented in this appeal ; for, if it be apparent that wrongs may be inflicted upon the community by the unsettling of the tenures of property and the rules for the settlement of estates by the judicial abrogation of a rule which we may conceive to be against law, and which more than counterbalance the justice of the application of what we conceive to be a correct and true application of the law, it may be considered our duty to adhere to the error. It was once said that it were better to adhere to an old error than

Bushnell vs. Dennison—Opinion of Court.

to promulgate the truth, but we cannot understand that we are instructed by the sages that this is good law or sound philosophy. If one be deprived of that which he is plainly entitled to by an adhesion to arbitrary rules of convenience, based upon sage precepts which have become venerable without pretence of having foundation in justice or correct expositions of written law, we do but sacrifice the rights of the innocent for the sake of maintaining an error and protecting a right of a third person which has no foundation but in wrong and in the perversion of the law. If a party establish a right to the satisfaction of our judgment and conscience, and has not lost that right by his own conduct or laches, must we deny its enjoyment to him because it has been an uniform practice of courts, in this or some other age, to deny such rights to others?

Referring to the case before this court, we are not driven even to the resort of announcing new doctrines or upsetting the long current of judicial dicta, if we shall come to a conclusion other than that found in Jones vs. Dexter; for against that decision we find this question otherwise determined seventy years ago in that State, which, at the time mentioned, had produced statesmen and legal philosophers second to none in any country. Next, for thirty years, down to 1859, the same rule was observed and the words of the law were given the same meaning in Florida that they had borne elsewhere. And we may feel that we are guilty of no serious innovation upon a rule of property or propriety if we declare our convictions that a rule of ten years' standing may be revoked, and that a contrary rule should prevail which we are satisfied is correct and which has been approved for seventy years by the judicial mind of the country, without apprehending that a long train of serious consequences will follow the declaration.

It is an established rule of construction that an act of Parliament shall be read according to the ordinary and grammatical sense of the words, unless, being so read, it

would be absurd or inconsistent with the declared intention to be collected from the rest of the act, or unless an *uniform series of decisions* have already established a particular construction. (Broom's Maxims, 248.)

The law regulating descents, as it stood in 1828, (when the act providing for the distribution of personal estate was passed,) provided that whenever any person, having title to real estate of inheritance, shall die intestate as to such estate, it shall descend in parcenary to the male and female kindred in the following course, that is to say : 1, to his children or their descendants, if any ; 2, if there be no children nor their descendants, then to his father ; 3, if there be no father, then to his mother, brothers and sisters and their descendants ; 4, if there be no brother nor sister nor their descendants, the inheritance shall be divided into moieties, one of which shall go to the paternal, the other to the maternal kindred, &c.

The act of 1829 embraced and re-enacted these provisions, and the provisos, being paragraphs 10 and 11, were added to and incorporated in it as a part of the law regulating descents, and all laws not coming within the purview of this act were repealed. It is conceded that the " law regulating descents," mentioned in the act for distribution, is such law as may be in force when the contingency occurs, and such was the view of the court in Jones vs. Dexter.

The rules for construing statutes, quoted in that case, are the true guides in endeavoring to ascertain the intent of the Legislature, and to solve questions of doubt, and we shall be guided by them. It is upon the application of those rules to the matter in question that we are forced to differ, with all deference, with the majority of the court in that case.

There is also a primary rule very proper to be observed in reference to legislative acts, which is, that the true meaning of a statute is generally to be sought from the body of the act itself; that the intention of the law-maker is to be deduced from the whole and every part of a statute. And

Bushnell vs. Dennison—Opinion of Court.

when the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view. Several acts or provisions *in pari materia*, and relating to the same subject, are to be taken together and compared in the construction of them, because they are considered as having one object in vew.

Before the enactment of the provisos, the property, real and personal, of every person, whether an adult or an infant, dying intestate, was, by the statute, distributable according to the course last above quoted, that is: first, to children; second, if there be no children to the father; third, if there be no father then to the mother, brothers and sisters; fourth, for want of these, the inheritance to be divided into moieties, and one-half to go to the paternal and other half to the maternal kindred, &c. The rule was changed by the law of 1829, so that the real estate of a class of persons, viz: infants, should go to the paternal or maternal kindred, according to the source from which it was derived, saving the rights of dower and tenancy by the courtesy, as the case might be. The presumption is, that the Legislature which enacted this proviso was cognizant of the law as it stood before, and of the effect of the remedy they then proposed; that they knew that the law already provided that the personalty should be "distributed according to the provisions of the law regulating descents;" and it is certain that the "law regulating the descent" of the real property of an infant was, by the proviso, to go in a direction other than the property of an adult. With the statutes before them, and with the construction and application that had been given by the courts of the State whence the law was derived also before them, it is not to be doubted that if they had intended that the personal property of infants should not go to the same persons as the real property, they would have said so in plain words, instead of leaving the plain words, already written, to stand against such intention.

But it is urged that "the nature of the property, and the title by which it is held, to say nothing of the inapplicability of the saving clauses in those provisos, show that it could not have been the design of the Legislature that they should apply to personal property."

It seems to us not difficult to imagine that personal estate, whether in specific property or in dollars, may be bequeathed or directed in general terms to be distributed according to the rule provided in a will for the disposition of real estate, whether according to the proportions or the persons to whom it may be devised. What is there in the nature of personal property that is repugnant to such a disposition of it? What is there in the origin of the title of personal property which prevents its distribution by the same rule? Is it impracticable to bequeath (and to execute the bequest,) that certain personal property derived from John Doe shall go to one person, and that derived from Richard Roe shall go to another person? And if an executor or a guardian shall have suffered such property to be intermingled with other property, so that its *identity* cannot be easily ascertained, should that defeat the wish of the testator? Is there no means by which the *value* in such case may be ascertained? By what law may a guardian suffer the property of an infant derived from different sources, to be so lost in identity that a bequest by a testator of property to an infant and to a third person, in case of the death of the infant, may be defeated, and such third party thereby deprived of a remedy? Or, if the guardian shall have properly performed his trust, and the property *may* be distinguished, what will prevent the execution of the bequest? If the identity of the personal property of an infant be lost by carelessness or by confusion, somebody should be accountable for it. That personal estate derived from different sources *may* be so confused as that its subsequent identity may be difficult, it does not therefore follow that it should be so.

But, it is said, that the "saving clauses" in the provisos

are inapplicable, and therefore the provisos cannot apply to the personal estate. The real estate of the infant derived from the father, by the provisos, goes to the paternal kindred to the exclusion of the maternal kindred, saving the right of dower to the mother of the infant. This saving clause of course applies to real property, and does not apply to personal; and if it does not affect the personal estate, how can there be any difficulty in distributing the personalty to the same persons as are entitled to the realty, though the realty be encumbered by dower interests, or leases, or mortgages, or other determinable estates? It is rather the inapplicability of the provision for dower in relation to personal estate that must be rejected in the distribution, rather than reject the provision for distribution, because of the provision for dower in real estate. The provision relating to dower was probably unnecessary, as the widow is entitled to dower at all events, and that provision might have been wholly omitted without affecting the widow's right, as it was omitted in the law of descents generally. What becomes then, of the objection that the clause saving the dower because of its inapplicability in distributing personal estate, is incompatible with the distribution act, and that, therefore, the personal property cannot be distributed under the provisos? As well may it be said it cannot be divided at all in accordance with "the law regulating descents," because under that law the widow is entitled to dower in the property to which it refers, and the "saving clauses" are no more necessary in the one law than in the other for the protection of her interests.

Another objection to the application of the act of distribution is, that it may work unjustly, in that the property derived by the infant "by descent from the father," may have been derived by the father from the dowry of the wife by the marriage according to the common law, and therefore, the exclusion of the mother from taking such property

7

is pernicious, and could not have been intended by the Leg-
islature without presuming that they were ignorant of the
canons of the common law, which give all the wife's per-
sonal property to the husband. Even if such objection might
properly be urged against a legislative enactment, and the
courts refuse to give it effect because of the apparent or pos-
sible injustice of its enforcement, and because it may not be
"consonant with the best affections of the heart," or com-
mend itself to the general approval of mankind, it can have
no force in this State at the present time, for since A. D.
1845, all the property of a woman acquired before or after
marriage is her separate estate, the husband having no in-
terest in it during coverture, except in the character of a
trustee or a tenant.

But this objection to the injustice of the law in the re-
spect mentioned, was equally potent against the rule of the
common law, which deprived a married woman of all her
personal property and all control over her real estate; and
if it be the province of the courts to nullify laws, because of
the injustice and hardship of their application, there has
been for centuries ample opportunity for the fulmination of
the judicial thunder against this most unnatural, unjust and
oppressive law, handed down through the progress of civili-
zation, almost intact, from the confines of barbarism.

This argument, however, we conceive to be appropriate to
be addressed rather to the Legislature than to the judicial
department. The court of Virginia, after pronouncing its
judgment in obedience to a hard statute *ex mero motu*, be-
sought the Legislature to change the law, and it was done.
The argument springs from the kindliest affection, and ad-
dresses itself to our humanity. We cannot conceive why
the mother, who has spent her youth and strength in a labor
of love and devotion to her child, should, after burying it
from her sight in its narrow house, be turned from her home
beggared, "according to law," with neither the consolation
nor compensation of sharing in the property of her dead child,

Bushnell vs. Dennison—Opinion of Court.

even though the property may have been brought home by herself, or earned by the joint labors of herself and her husband. And there may be injustice in the other course of the law of descents. One of two children who have inherited a fortune in money and goods, of plate and family pictures, and mementoes from their father, dies, leaving several brothers and sisters of the half blood, the children of the mother's second marriage. By the law of descents, without the "proviso," the surviving child must divide the patrimony with the children of a stranger to his father's house and name, and surrender to them or purchase from them the property and family jewels earned and acquired by the labor of his own ancestors, and thus become impoverished and beggared upon principles of "natural affection," and according to the statutes. And again, if the mother take by right of inheritance the personal estate of the child, which was derived from his paternal ancestors, and the mother happen to become the wife of another, by the rules of the common law the property inherited becomes, upon the marriage, the property of the second husband, and so, practically, the second husband becomes the heir of the child of another, through those same principles of natural affection which are invoked to control the application of this statute.

But the courts are not responsible for the language of the written law, and are not accustomed to explore the fields of romance in quest of rules for their guidance in construing statutes or applying the law. Persons who become possessed of considerable property generally dispose of it by will, and if they neglect so to dispose of it, or if they are from infancy or other causes incapable of disposing by will, the law, after their death, regulates and directs the manner of its disposition and distribution, and so the law makes a will for the intestate. We do not think that a last will and testament directing the course of personal property according to the rule prescribed by the provisos in question, would be set aside because of the supposed inapplicability of the saving clauses,

or that it would be found impossible or impracticable to carry out the intention of the testator, and this being the case, we cannot allow a possible inconvenience to control, and so disregard the positive provisions of the statute.

In this case, the mother of Isabella Forsyth died before the death of Isabella, so that with respect to the natural claims of the mother no argument can be attempted. The question is, whether the sisters Josephine and Mary are entitled to the property of Isabella, which came to her from her father, or whether they must divide it with the half brother, William Dennison. The common law of England would give the property to heirs of the whole blood, disregarding those of the half-blood. Many, and probably most of the States of this country give certain portions of the estate, if there be no direct heirs, to kindred of the half-blood, and this is the law here, but the *provisos* in question give the property of infants, derived from their father, to the kindred of the father only, and except that the mother ought not in justice to be excluded, we cannot say that the law so understood should be changed.

We think the property of Isabella derived from her father, descended, (under the statute of distribution and the provisos which are parcel of the law regulating descents,) to her sisters of the whole blood, and believing that upon the death of Isabella the property vested in the sisters, we cannot, with only the single and recent case of Jones vs. Dexter before us upon the one side, and the older adjudicated cases and the uniform rule of those cases adopted and followed in this State up to the time of the decision in Jones vs. Dexter, affirm a decree that the sisters shall be deprived of any portion of the property which we believe belongs under the law to them. Had the doctrine of the latter case been so long acquiesced in and followed as to become such a rule of property that any considerable mischiefs would follow the reversal of that rule, we should be inclined reluctantly to acquiesce in it and consent to the sacrifice of the strict rights of

these appellants "for the public good;" but as we do not feel obliged to adopt the rule in that case, we are not embarrassed in deciding that the order of the Circuit Judge overruling the demurrer should be reversed.

WESTCOTT, J., delivered the following dissenting opinion.

The question involved in this case is whether the distribution of the personal estate of an infant decedent is to be made according to the rule prescribed for the descent of his real estate. This question is not *res integra* in this State. It was determined in the negative after argument and mature consideration in the case of Jones vs. Dexter, decided by this court in the year 1859.    8 Fla., 296.

The argument of counsel for appellants, the opinion of the majority of the court in this case, and the dissenting opinion of Mr. Justice Baltzell in the case of Jones vs. Dexter, (8 Fla. 296,) are based principally upon an assumed similarity of the questions involved in this case, with the questions involved in the cases of Tomlinson, *et al.* vs. Dillard, 3 Call, 98, decided by the Court of Appeals of Virginia in 1801, and of Dillard vs. Tomlinson, Wyatt *et al.*, (1 Munf. 198,) decided by the same court in 1810. It is necessary therefore to enquire whether the cases are similar, and to a complete understanding of the subject it is essential that the history of the legislation in the two States in the matter of descents and distributions should be stated and compared.

In 1785, the Legislature of Virginia passed an act regulating descents, which Chief Justice Reeve of Connecticut describes as " an act drawn with great accuracy and legal science." This act prescribed the *same rule for the descent of the real estate of an infant as of an adult.* In 1790, the Legislature of Virginia amended this act of 1785 and changed the rule of descent where an infant died having title to real estate of inheritance, by providing that the maternal kindred should take no share in the real estate derived

by purchase or descent from the father, at the same time ex-
cluding the paternal kindred from any share in the real es-
tate derived from the mother, saving in all cases the right of
dower of the wife and the right of the husband as tenant by
the courtesy.   In 1792 a new act of descents was passed in
Virginia incorporating these acts of 1785 and '90 into one
act.   This is a brief statement of the legislation of Virginia
upon the subject of descents up to the time at which the
case in 3 Call arose. ·  The legislation in the same State reg-
ulating distributions was as follows :   In 1785, and at the
same session at which the act regulating descents was passed,
an act regulating the distribution of the personal property
of intestate decedents was passed, which provided that the
surplus of chattels " *should be distributed in the same pro-
portions and to the same persons as lands were directed to
descend in and by an act of the General Assembly, entitled
an act directing the course of descents,*" which was the before
mentioned act of 1785.   This act controlling distributions
remained in force until 1792, when all of the acts upon the
subject of descents were, as before stated, reduced into one.
A distribution act was passed at the same session.   It pro-
vided that the surplus of chattels should be distributed
to the *same persons and in the same proportions as lands
were directed to descend,* by an act of the General Assembly
entitled an act to reduce into one the several acts directing
the course of descents, which was the before mentioned act
of 1792, embracing the provisions of the acts of 1785 and '90.
So we see that the act regulating descents and the act regu-
lating distributions, which were in force when the case in 3
Call arose, were each passed at the same session of the Leg-
islature, and the distribution act adopted in very words the
rules of descent *prescribed by a particular act* as the rules
for distribution.   It is also seen that in Virginia the change
of the law in respect to the descent of the real estate of an
infant was made in 1790, and that there was no pretence
that this change was extended to distribution until 1792, and

that the rule for the distribution of an infant's chattels was without question the same as that for an adult's, from 1785 to 1792.   It is remarked by Judge Roane that it was not the intention or purpose of the Legislature of 1792 to alter the law in reference either to descents or distributions, but to reduce the existing laws upon each subject into one act. This remark is certainly sustained not only by the fact that the alteration so far as distributions was concerned, was made some time after the same modifications in the rule of descents, but also by the particular character of the legislation of that session.

Upon examination it will be found that this session was principally devoted to a consolidation of the several laws upon different subjects.   Thus we have acts to " *reduce into one*" the several acts concerning executions, a like act as to fees of officers, a like act as to the practice of the Court of Appeals, a like act as to the court of chancery, a like act as to the general court, and five other acts of similar character.

We have thus the legislation in Virginia upon these several subjects when the decision in 3 Call, to the effect that the personalty of an infant should be distributed as his realty would descend, was announced.

We next inquire as to the legislation in this State upon these subjects up to 1859, when the decision of Jones vs. Dexter was announced.

In the year 1822, an act regulating descents was passed, which was substantially the same as the act of 1785 of Virginia.   *In 1828, a consolidation act upon the subject was passed.   It, however, made no distinction in the law of descents when applied to infants and adults.*   In 1829 the act of 1828 was repealed, and a new act passed containing substantially the provisions of the act of 1828, and in addition thereto provisos making a difference in the rule to be applied to the real estate of an infant, and the rule to be applied to that of an adult, by providing that an infant's real estate

should go to the maternal kindred if derived from the moth-
er, and to the paternal kindred if derived from the father.
(Thomp. Dig. 189.)   As to the statutes regulating distribu-
tions, there has never been but one act upon the subject.
This act was passed in 1828 and it provided that distribu-
tions should be made " according to the provisions .of the
law regulating descents."   This statute was enacted with
reference to the then existing act of 1828 regulating descents,
which made *no difference in the rules to be applied to infant's
and adult's real estate*, so that while upon the repeal of the
statute of descents of 1828, and the enactment of the statute
of 1829, the legal effect of this legislation may have been as
was decided by the majority of the court in Jones vs. Dex-
ter, and in this case, to make the rule enacted in 1829 con-
trol the distribution, yet this result follows from a rule of
construction adopted by this Court rather than from any
intention of the Legislature expressed in *totidem verbis* to
that effect.   Hence it cannot be said of the statute of dis-
tributions in Florida, as was said of the statute in Virginia,
that it adopts the statute making a difference between the
rule applied to the property of an infant and that of an adult
in express language, leaving no room for the operation of
established rules of construction by which the intention of
the legislature may be determined.

With this, I think a correct statement of the legislation in
the two States, we are prepared intelligently to analyze the
case in the one State and ascertain whether it is analogous to
the case in the other, as well as to examine the grounds of the
opinions of the several eminent jurists that have entertained
different opinions upon the subject in the several States.   An
examination of the opinions of the several judges in Virginia
will show that the peculiar phraseology of their statute of
distributions had a controlling influence upon them.   Not
one of them was pleased with the result they reached.   They
appealed to the Legislature to change it, which was prompt-
ly done.   So that the rule established by the Virginia de-

cision was condemned by every member of the Court and by the Legislature in Virginia. The statute of distributions in Virginia, as we have seen, declared that the personal property " *should be distributed in the same proportions and to the same persons as lands are directed to descend in and by an act of the General Assembly entitled an act to reduce into one the several acts directing the course of descents.*" Judge Fleming admitted the confusion and difficulty which would result from the application of the rule prescribed for the descent of an infant's real estate to the distribution of his personal estate, but said, I am "bound down by the positive precepts of the adopting statute." Carrington, Justice, said that while the rule was inequitable, the terms were too explicit to admit any latitude in construction, that the declaration that the personal property shall be distributed " *in the same proportions and to the same persons*" was too positive. Pendleton, President, said, " the words of the law appear to me to be too strong to admit of any construction by this Court."

Having thus stated the reasons given by the majority of the court in Virginia for the decision, it is well to refer briefly to the reasons given by Mr. Justice Roane (who dissented) for his conclusion that the provisos in the Virginia statute regulating the descent of the infant's realty did not control the distribution of the personalty. In the first place he admitted that the word and letter of the statute were positive and express, but contended that even this unequivocal expression by the Legislature might be controlled by consequences and the reason of the law taken on a general view, and maintained that the provisos should be rejected in the distribution of personalty for the following among other reasons : Because they were provisos containing terms only applicable to real estate, such as the words descent, dower, and courtesy, and that the same principle which justified the rejection of these *particular* terms, as applied to personalty, justified the rejection of the entire section ; because

while in the case of realty there could be a reciprocal operation of the statute as between the maternal and paternal lines, yet this manifest intention of the Legislature could not prevail as to goods and chattels brought by the wife to the marriage, as by the marriage they belonged to the husband; because it could not have been the intention or design of the Legislature, in the event of the death of an infant child, by a first marriage, to deprive the mother and her children, by a second marriage, from enjoying any portion of her own personalty, brought to the family upon the first marriage, and to bestow it even to the exclusion of the mother upon the children of the first marriage; because there was a difference in the nature of the subject matter of the two statutes, which rendered it impossible for it to operate as a general rule; that the idea that the Legislature intended to apply the principle of the first purchaser to the case of chattels, could not be sustained on account of the absurd consequences which would result; that while the words of a statute separately taken might be clear, yet, if when applied to a different subject matter than they were originally intended to control, the results were inconvenient and absurd, and these results grew out of the difference in the nature of the subject matter, the rules of construction required that it should be held that such was not the intention of the Legislature; that the clear intention of the Legislature in the matter of the descent of infant's real estate was, that property coming from the mother should go to her relations, as well as the converse in reference to the father, while to follow the letter as applied to personalty it would result that all personal property, however derived, would go to the relations on the part of the father. (3 Call, 96; 1 Munf., 190.)

We have thus given the views of the majority and minority of the court in the Virginia cases, and are enabled to see precisely what those cases were.

In the case of Jones vs. Dexter, (8 Fla., 296,) the Supreme

Court of this State (Baltzell, J., dissenting,) held that the provisos did not obtain here in the distribution of the infant's chattels contrary to the decision in Virginia.

It reached that conclusion by the application of two principles of construction, which it announced as follows:

1. That where the provisions of an act are adopted by a general reference, the act will receive a more liberal construction than if originally passed with reference to the particular subject.

2. Where a statute has been enacted with special reference to a particular subject, and by another statute its provisions are directed in general terms to be applied to another subject of an essentially different nature, the adopting statute must be taken to mean that the provisions of the original statute shall be restrained and limited to such only as are applicable and appropriate to the new subject.

The first named rule is certainly sustained by the authorities cited in that case, (Dwarr. on Stat., 508, 602, 556; 2 Inst., 287; 6 Q. B., 343; 2 Vatt., ch. 17, § 285; 1 Hare, 210,) and I think it cannot be doubted that the particular nature of personal property was, under the circumstances, a matter to be considered, and if the nature of that property rendered these provisos inapplicable to it, and produced consequences absurd in their character, or in conflict with the reason of the law, that they were properly held inapplicable. The court in Jones vs. Dexter justified its difference in conclusions from the Virginia case, to a considerable extent, by the difference in the precise words used in the adopting statutes of the two States, showing that the words in the Virginia statute were " special and definite," admitting of no construction, in the opinion of that court, while the language in the Florida statute was general and not of such character as to prohibit the application of the ordinary rules of construction. There was no such language in the Florida statute, as we have seen, was employed in the Virginia statute. This court, in Jones vs. Dexter, did not propose to contro-

vert the Virginia decision when viewed in reference to the legislation of that State, but on the contrary, the difference in the conclusions is based principally upon a difference in the precise character of the legislation of the two States.

As between jurists of such ability as composed the court deciding the case in Virginia, I would not presume to settle differences as to the effect of their legislation, but I am entirely satisfied that not only do the differences in the legislation of the two States, which were mentioned in the case of Jones vs. Dexter, exist, but I am also satisfied that there is another and additional fact, not alluded to in that case, which would have had great weight in leading me to the conclusion that the provisos should not be extended to personal property. This is, that in Florida it is only by virtue of the fact *that the court held* that the statute of descents in operation at the time the distribution should happen, should control the distribution, that *these provisos became in any view operative as a rule of distribution.* They were not in existence when the distribution act adopting the rules of descent as the rule for distribution was passed, (A. D. 1828,) and these provisos could not therefore have been in the mind or within any conceived or expressed intention of the Legislature, as was the case in Virginia. These provisos were brought into effect by the legislation of 1829. It was not by virtue of any express and particular language of the Legislature adopting this precise rule that these provisos could, in any event, be made applicable to personalty. The Legislature did nothing more than change the law of descents, *and the operation of a rule of law prescribed by the court* made this the rule for the distribution of the personalty. To my mind there is a manifest difference between following the express and positive precepts of a legislative enactment, as was the case in Virginia, and the controlling and restraining the operation of a rule announced by the court, in a case of doubt, by the nature of several subjects to which it was to be applied. The Legislature in Florida never de-

clared in words that the rule of descents in operation when the distribution should happen should control distributions. The court announced this as the result, in its opinion, of the legislation upon the two subjects. It was absolutely necessary for the existence of any rule that it should so hold, because the statute of descents in operation when the act of distribution was passed, and in reference to which the Legislature acted, had been repealed, and unless the new rules of descent were held applicable, there was no rule, as there was no other law of descents. It was through the operation of this rule that these provisos were sought to be made applicable to distributions. The real effect of the decision of Jones vs. Dexter was, therefore, to control this rule (prescribed by the court in a case of doubt,) in its application, and not to over-ride or modify the letter of a statute passed by the Legislature in view of all the facts. The act of distributions in this State was passed by the Legislature when there was no distinction in the rule of descents to be applied to adults and infants. The same rule applied to each. That rule was based upon the general principle of regarding the person last seized or having title as the true owner, and as the person whose presumed affections were to be objects of the bounty of the statute. It rejected the principle of looking to the blood of the first purchaser, and did not, in the case of an infant, require the source from which the property came to be ascertained. Hence, so far as the *Legislature* has ever expressed any view upon this subject of distributions, it is that the rule governing in the case of adults should govern in the case of infants. This department of the government has never said that the exception as to the descent of an infant's realty should extend to the distribution of his personal property, and when we have seen the difficulty in the application of this rule, and its conflict with the general principle underlying the whole system, as I shall subsequently show, I do not believe it will ever prescribe such a rule.

These differences in the precise character of the cases in Florida and Virginia become very important when we recollect the history of this legislation, the causes which prompted it, and the leading principle upon which is bottomed the system of descents and distributions, not only in Virginia but in this State, and a majority of the States of the Union. It cannot be doubted that a system of descents which was created to foster and perpetuate an aristocracy, itself an element of power in the government, is not suitable for a republic, in which the existence of such a privileged class is inconsistent with the essential principles upon which such a government is founded. While, therefore, upon the success of the American revolution it was entirely proper for the several States of the Union to adopt the principles and rules of the common law controlling ordinary commercial transactions between its citizens, it became the duty of their jurists and statesmen to devise a system of descents conforming to the genious of our government, and to abandon, in a great measure, rules obtaining in England, which were the off-spring of the feudal system, adopted at the behest of a landed aristocracy to perpetuate their wealth and preserve the privileges of their class.

In England, the canons of descent kept constantly in view the blood of the first purchaser. It was the fundamental principle of the law of collateral inheritances, that upon the failure of issue in the last proprietor, the estate should descend to the blood of the first purchaser. Our people, opposed to keeping up the wealth of families, to entails, and to primogeniture, adopted a system like that obtaining among the Jews, Greeks and Romans, disregarding, to a great extent, the source from which the land was derived, and based upon the idea that the person who died intestate and last seized of the estate, or had title thereto, was the absolute owner, and that his presumed affections should be consulted rather than the presumed desires of some remote ancestor who had first acquired the estate. The one system,

looking to the desire of the first purchaser, and which obtained almost exclusively in England, designated as objects of its bounty those only whom he would naturally desire so to be, while the other, looking only to the person last seized or having title, would betsow the benefit according to his presumed natural affections. Hence, under the general rule of descents in Virginia and Florida, the mother and her descendants took an interest in the estate, though it was derived from the father, in the contingency that there was no issue or their descendents, or no father of the decedent living. In violation of this principle, upon which the whole system was founded, and in some cases palpably contrary to the natural affections of the person who last owned the estate, an exception was made in Virginia in the case of an infant decedent, and it was provided that his real estate, if derived from the father, should in no event go to the mother or her descendants. We thus see that this provision, even as to the descent of the realty of an infant, was in violation of the principle underlying the whole system, and while some good reason for a change may have existed, I certainly cannot conceive why the fact that a person is under twenty-one years of age should change the rule. It is well, when we consider the matter of distributions, to bear in mind that this exception, even as to the *real estate* of an infant, is contrary to the general principle of the legislation of these States, and that this general principle was established after the most mature consideration of the subject by the fathers of the republic. If we recollect that a majority of the court in Virginia failed to avoid the consequences of the rule they prescribed, for the reason that the letter of the statute was positive, and the intention of the Legislature was too plainly expressed to doubt, it is not a violent presumption to suppose that the court in Virginia, under the circumstances existing in Florida, would have made the same decision that was made in the case of Jones vs. Dexter in this State.

I would here leave this branch of the subject, but there is

one matter which was urged so much in argument, and which is deemed so material by the court, that I feel constrained to say something. That is the difficulty of tracing personal property to the source from which it came, and the difference in this respect between land and chattels, which occasions the rejection of the provisos, which, when applied to personalty, would require chattels to be traced. The argument as well as the view of the court, in respect to this matter, is, that no such difficulty exists in tracing chattels as should justify the rejection of the provisions of the statute of descents which would require chattels to be traced. I think, if a case of this character is simply stated, its difficulty if not impossibility will be seen. Take the only case in which what is called the reciprocity of the statute could operate. An infant derives personalty from the father, and then derives personalty from the mother. This infant dies, having representatives both in the maternal and paternal lines. Recollecting that the rents, issues and profits of this property would not follow the rule prescribed for the corpus or principal, (1 Munf. 215,) but would follow the rule for adults, the general rule, there would be a necessity to ascertain what portion of the property consisted of the increase of animals and interest upon moneys. I think it is manifestly impossible to apply such a rule without great inconvenience. I cannot think it was the intention of the Legislation to adopt a rule which would require a guardian, in order to protect himself, in case his ward should die, to be able to identify the sheep, cattle and other animals derived from each parent, as well as the increase of each stock so derived from the original parent stocks, and to keep distinct accounts of the principal and interest of moneys, and what portion of the infant's expenses and necessary expenditures, in connection with the property, are paid from the interest of the one fund or the other, and so on. In a majority of cases, he would never be able to distinguish what portion of stock came from the one parent or the other, as the animals of this character,

upon a farm, generally composed one flock and the increase bear one mark.   In all cases where each parent had securities of like character, how would the source to which each remaining security belonged be ascertained, in the event a portion of them was destroyed by fire ?

As remarked by Judge Roane, " chattels are of a fluctuating nature, the property of some consisting in their use and are not traceable, and, after a lapse of twenty-one years, great inconvenience as well as litigation would ensue from attempting it, while, on the contrary, land is permanent and indestructible, and can be traced *ad infinitem*."   In every age and in every country, from the time that an exclusive right of property could be acquired, wherever there was a government to prescribe rules, these rules have recognized a difference between real and personal property.   The common law, moulded, shaped and created from the feudal system, made differences in the acquisition, in the manner of enjoyment and the disposition of these two characters of property, and, in the nature of things, you cannot well make a general rule applicable to one applicable to the other. You should restrain and modify the rule according to the nature of the several subjects, unless the intention of the Legislature is otherwise clearly expressed.   At common law, upon the marriage, the chattels of the wife vested absolutely in the husband.   In this State, this rule was modified in 1845, and the wife's title to personal property here continues separate, independent and beyond the control of her husband, although she cannot sue her husband for the rents, issues and profits thereof.   While this may permit what is called the reciprocity of the statute to operate at the present time more frequently, it is obvious that it increases the difficulty in enforcing the rule contended for, because, if the rule of the common law was operative, there would be, in all cases where the husband survived the wife, no necessity for such an inquiry, as the personal property would all belong to

8

the husband.  I remark just here that this change in the rule of the common law did not exist in 1828, when our statute of distributions was passed, or in 1829, when the act regulating descents was passed, and therefore it could not have affected the legislation of 1828 and '9.

Leaving the comparison of the cases in Virginia and Florida, I now come to the consideration of the present case. This case is here under circumstances very different from those under which the case of Jones vs. Dexter was before this court in 1859.  We are asked to 'overrule that case in so far as the court held that the provisos did not control in the distribution of an infant's chattels.  Under what circumstances and for what reasons are we asked to reverse this decision ?  The case of Jones vs. Dexter is the only decision of that point ever made in this State by the Supreme Court, after argument and consideration.  The matter involved was the construction of a statute, and the result of the decision was to establish a rule of property.  Potent indeed must be the reasons to justify us in overruling such a decision, existing now for eleven years unassailed and unquestioned.  It is urged, and it is true that the judgment rendered in this court in the case of Young's adm'r. vs. McKinnie's adm'r., 5 Fla., 542, covered the point, but the question decided in Jones vs. Dexter, and now involved here, *was not argued*, *nor was the point even raised*.  All of the authorities concur in the statement that a case, to become authority so that the rule *stare decisis* will apply, must not only involve the point, but the precise question must have been raised and determined upon consideration.  It is also true, as is urged, that in 1845 one of the judges of the Circuit Court held that the terms, " the law regulating descents," used in the distribution act, " was such law regulating descents as might be in force when the contingency happened."  This ruling is certainly not in conflict with the decision in Jones vs. Dexter, which states the same general rule for distributions.  Whether the provisos as to the descent of an infant's realty shall

apply in the distribution of his chattels was not considered, so far as we are advised, and if it had been considered and expressly determined, we could not accept the judgment of the Circuit Court as authority. The cases in Virginia, while entitled to great respect, are, as we have seen, different from this case, and even if they were identical, the doctrine of *stare decisis* could not be invoked here by a reference to them, as that doctrine is only applicable in its full extent and force within the territorial jurisdiction of the courts making the decisions. This doctrine is applicable in its full force and extent to the decision in Jones vs. Dexter. It is urged again, that it was the opinion of the bar for a series of years that the provisos controlled the distribution of an infant's chattels. I cannot say whether this is correct, but I can say that if the bar understood the matter and reflected upon it, it is about the only instance in which there was but one opinion among professional men upon a question of like character and surrounded with the same difficulties.— Where judges clothed with all their responsibilities entertain different opinions, it is not likely that the bar will agree.

If I concur with the majority of the court, I must therefore, upon these grounds, overrule a decision of this identical question, made eleven years ago by this tribunal, upon argument and after due consideration—a decision, too, construing a statute and establishing a rule of property. The effect of this decision is to declare that the rule announced in the case of Jones vs. Dexter never was law, and, in some cases, to unsettle estates which have been settled by the courts according to that rule. It also disappoints all testamentary dispositions of property which were affected by a knowledge of this rule and made in view of it.

The wife's personal property remaining under the provisions of our statutes her own, notwithstanding coverture, the case of a mother having infant children by two marriages and considerable personal property, is not a very rare one. Mothers in this situation have been justified in making

testamentary dispositions of their property for eleven years past, in view of the rule that, in the event of the death of an infant child by the first marriage, the personal property it derived from its father would to some extent go to the children of the half blood surviving. We therefore disappoint dispositions based upon the devotion and affection of the mother to the child, the purest and most unselfish attachment that exists. I might multiply illustrations of this character, as it is almost impossible to estimate the results which follow the change of a rule of property, but it is unnecessary. *Stare decisis* is a safe and prudent maxim, and while in questions of practice and like matters we may, in cases of palpable absurdity accompanied with injurious results, reverse a rule, yet I cannot consent thus to act where, for eleven years, all classes have had a right to regulate their action and to be controlled in the disposition of their property by this rule, established by the highest tribunal in the State. It seems to me that the court which, for the equities of some individual case, reverses the rule to be applied to all cases, commits a much greater wrong by destroying all other settlements than it would in enforcing the rule in the one case, even if the original rule was wrong. To be controlled by the equities of the one case here, is in effect to do justice to one by doing great wrong to many, and I conceive that this cannot be correct either in morals or in law. Sir James Mansfield, (4 Bos. & Pul., 69,) speaking of this subject, says: "It is of greater consequence that the law should be uniform than that the equitable claim of an individual should be attended to." Whatever doubt I may have had on other branches of this case, I have had none here. What say the authorities in reference to overruling decisions of this character? It has been remarked that a court in deciding almost any question, "creates a moral power above itself." In a case before Lord Kenyon, (7 Term Repts., 242,) it was urged in argument that a certain doctrine in reference to the revocation of wills

was not bottomed on reason, and that it would be absurd to permit it to prevail.   His reply was simply that if such an observation was an answer to a rule of law, it might be applied with equal success to a variety of other instances ; and in referring to some objections taken to a rule of descents which excluded persons of the half blood, he remarks that "it is sufficient in answer to objections to establish a rule of law of this kind to say, '*ita lex scripta est.*'"

The Earl of Lincoln's case (Show. Par. Cas. 154,) announced the rule of law, that where a man seized of an estate, makes his will, and devises it, and afterwards conveys it entirely away, though he takes it back by the same instrument, it is a revocation.   Lord Mansfield, speaking of this rule, said that it was "not founded upon truly rational grounds and principles, nor upon the intent, but upon legal niceties and subtlety," but that it was so far established by the Earl of Lincoln's case, that it ought to be observed in future if a like case should happen.   (2 Eng. Com. Law, 22.)   Says he, we must not depart from it now, notwithstanding we would wish that no such rule had ever been established.

Lord Mansfield again says, (1 Burr. 419,) "when solemn determinations acquiesced in formed a rule of property, they ought, for the sake of certainty, to be observed as if they had originally constituted a part of the text of the statute."   It is needless to multiply quotations upon this subject.   The authorities, both in England and in this country, are almost without number, 7 T. Rep., 416 ; 3 Barn. and Ad. 17 ; 3 Bing. 558 ; 1 Kent, 476 ; 16 John. 402 ; 20 John. 722 ; 23 Wen. 340 ; 7 Mich. 12 ; 1 Yerg. 376 ; 5 N. Y. 389 ; 30 Miss. 246 ; 2 Burr. 787 ; 5 T. R., 450 ; Cooley's Con. Law, 52. In cases of this kind, where the original question was the construction of a statute fixing a rule of property, the remedy should be the enactment of a new rule by the Legislature, the effect of which would be to change the rule in future and thus avoid the serious consequences attending the unsettling of estates.   We have seen that decisions of this kind will not

either in England or America be overruled, even though the previous rule was such as we would wish had never been established. In this case we in effect abolish a rule approved, after mature reflection and examination, both by the Judiciary and Legislature of the State from which our statute upon the subject of descents was derived, and establish, to operate both in the past and future, a rule which, after experiment, was disapproved by the same Judiciary, and which, at their request, (an unusual thing,) the Legislature promptly repealed. In addition to this, if it be true that the decision in Jones vs. Dexter, made eleven years ago, did not settle the law, then, applying this rule to this decision, it cannot settle it for the next eleven years. During this time, the lawyer who can give advice on this subject, or the citizen who can act with any certainty, must possess the power to unveil the future and know what will be our opinion or that of our successors at that remote date. It is with no pleasure that I differ with the majority of the Court in this case, but I cannot coincide with action involving such consequences.